[No. A127489. First Dist., Div. Three. Apr. 14, 2011.]

ANDREW SEYMORE et al., Plaintiffs and Appellants, v.
METSON MARINE, INC., et al., Defendants and Respondents.

COUNSEL

Law Office of Mark E. Merin, Mark E. Merin, W. Gordon Kaupp and Cathleen A. Williams for Plaintiffs and Appellants.

Sheppard Mullin Richter & Hampton, Tracey A. Kennedy and Marlene M. Nicolas for Defendants and Respondents.

OPINION

**POLLAK, Acting P. J.**—Plaintiffs Andrew Seymore and Kenneth Blonden appeal from a judgment entered in favor of their former employers, defendants Metson Marine, Inc., and Metson Offshore, Inc. (collectively Metson), on their complaint seeking to recover unpaid overtime wages. The trial court granted summary judgment in favor of Metson on the ground that Metson's compensation practices comply with the requirements of the Labor Code. When employed by defendants, plaintiffs worked consecutive 14-day "hitches" on Metson's ships, providing emergency cleanup of oil spills and other environmentally hazardous discharges off the California coast. They contend the trial court erred in granting Metson's motion for summary judgment because the undisputed facts establish that Metson failed (1) to properly calculate overtime for the seventh consecutive day worked in each workweek and (2) to properly compensate them for the 12 hours each day of a hitch that they were on call. We agree with plaintiffs that it is not permissible for Metson to artificially designate the workweek in such a way as to circumvent the statutory requirement to pay overtime rates for the seventh consecutive day worked in a workweek. We also agree that the restrictions placed on plaintiffs during their on-call standby hours, including the requirement that they sleep aboard the ships and remain within no more than 45 minutes of the ship at all times, subjected plaintiffs to Metson's control for the full 14-day hitch, so that the on-call standby hours constitute time worked. However, we do not agree that plaintiffs were entitled to compensation for 24 hours a day. California law authorizes employers to enter into an agreement with their 24-hour employees to exclude from compensation eight hours of sleep time in each 24-hour period and the undisputed evidence establishes that plaintiffs and Metson had such an understanding. Accordingly, plaintiffs are entitled to compensation for an additional four, but not 12, hours in each 24-hour period. Because Metson failed to establish that it had fully and correctly compensated plaintiffs for all

hours worked, the trial court erred in granting Metson's motion for summary judgment. We shall, therefore, reverse the judgment and remand the action for further proceedings.

### Factual and Procedural Background

Plaintiffs' complaint alleges causes of action for unpaid overtime wages under Labor Code[1] section 1194 and for unfair business practices under Business and Professions Code section 17200. The complaint alleges that Metson's "policy, practice, and customs regarding wages violate California overtime laws" and amount to an unlawful business practice. The parties filed competing motions for summary judgment and summary adjudication. The following undisputed facts were offered in support of the motions:

Metson provides "crew members and vessel operations for offshore oil spill recovery vessels." Metson's vessels must be prepared to respond to emergency oil spills 24 hours a day. Plaintiffs were employed as crew members on Metson's ships from before 2004 through December 2007.

As crew members, plaintiffs "worked on two-week rotational hitches, i.e., 14-day hitches, alternating with 14-day rest periods." Each two-week period started on a Tuesday at noon and ended at noon on the Tuesday 14 days later. However, Metson calculated overtime pay on the premise that the workweek began at 12:00 a.m. on Monday and ended at 11:59 p.m. the following Sunday. Under Metson's calculations, plaintiffs worked on six days in the first workweek, seven days in the second workweek and on two days in the third workweek. On that basis, plaintiffs were paid a single seventh-day premium at the end of the second workweek.

Plaintiffs were paid to work a 12-hour daily shift during this two-week "hitch," except on crew-change days, when they worked only six hours. Plaintiffs were paid an hourly rate for the full 12-hour shift whether or not they actually performed any work during the full 12 hours. Plaintiffs were paid their regular hourly rate for the first eight hours and time and a half for the additional four hours. On the occasions that plaintiffs worked more than 12 hours in a day while responding to an emergency, they were paid double time for all hours in excess of the usual 12-hour shift.

The remaining 12 hours in each 24-hour period were designated by Metson as "off-duty." Metson designated eight hours of the "off-duty" time as sleep time, three hours as meal times and one hour as free time. During the "off-duty" time, Metson required employees to be on "stand by." Crew

---

[1] All statutory references are to the Labor Code unless otherwise noted.

members could leave the boat during their "off-duty" time but were required to "check in and check out" when they left the ship. When employees left the ship, they were required to carry a cell phone or pager and be able to return to the ship within 30 to 45 minutes of an emergency call.[2] Metson provided sleeping quarters for the crew and plaintiffs were required to sleep on board the vessels. If an emergency was reported while the crew members were asleep, crew members were required to respond and return to work. Crew members were prohibited from consuming alcohol at any time during the two-week hitch. Blonden testified that when he was not working he might go for a walk or to the drugstore to pick up a prescription, read, watch television or call his wife. Seymore testified that when he was not working he ate, watched television, went for a walk or to the gym, and ran personal errands.

## Discussion

### 1. *Metson's Motion for Summary Judgment*

The trial court granted summary judgment in favor of Metson, concluding that the uncontroverted facts establish that Metson calculated plaintiffs' wages correctly. Plaintiffs challenge this conclusion, contending that they were entitled to an additional day of premium pay per hitch for working seven consecutive days in a workweek, and additional compensation for the 12 hours they were on call during their 14-day hitches.

### A. *Seventh-day Premium Pay*

Plaintiffs contend that Metson violated the Labor Code by failing to pay them a seventh-day premium on both the seventh and 14th days of each hitch. Section 510, subdivision (a) states in pertinent part: "[T]he first eight hours worked on the seventh day of work in any one workweek shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee. . . . In addition, any work in excess of eight hours on any seventh day of a workweek shall be compensated at the rate of no less than twice the regular rate of pay of an employee." Section 500, subdivision (b) defines a "workweek" as "any seven consecutive days, starting with the same calendar day each week. 'Workweek' is a fixed and regularly recurring period of 168 hours, seven consecutive 24-hour periods."

In a petition for rehearing, Metson emphasizes the persuasive value of federal law interpreting the meaning of "workweek" under the federal Fair

---

[2] In their briefs, plaintiffs suggest that the required response time was actually closer to 15 minutes, referring to deposition testimony to that effect. However, the undisputed facts, as set forth in both plaintiffs' and Metson's separate statements, state that the required response time was 30 to 45 minutes. In the context of this case, we deem the difference to be immaterial.

Labor Standards Act of 1938 (FLSA), 29 United States Code section 201 et seq. We agree that federal authority is persuasive insofar as it does not conflict with the remedial purposes of the California labor laws. (*Monzon v. Schaefer Ambulance Service, Inc.* (1990) 224 Cal.App.3d 16, 31 [273 Cal.Rptr. 615] ["California courts have recognized that California's wage laws are patterned on federal statutes and that the authorities construing those federal statutes provide persuasive guidance to state courts."].) However, it is also true that state law may provide employees greater protection than the FLSA. (*Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 592 [94 Cal.Rptr.2d 3, 995 P.2d 139].)

■ "Workweek" is defined under the FLSA, as in the Labor Code, as "a fixed and regularly recurring period of 168 hours—seven consecutive 24-hour periods." (29 C.F.R. § 778.105 (2010).) The federal regulation adds that a workweek "need not coincide with the calendar week but may begin on any day and at any hour of the day. For purposes of computing pay due under the [FLSA], a single workweek may be established for a plant or other establishment as a whole or different workweeks may be established for different employees or groups of employees. Once the beginning time of an employee's workweek is established, it remains fixed regardless of the schedule of hours worked by him. The beginning of the workweek may be changed if the change is intended to be permanent and is not designed to evade the overtime requirements of the Act." (*Ibid.*)

As noted above, plaintiffs, like all of Metson's employees that worked aboard Metson's ships, worked a regular 14-day schedule beginning at noon on Tuesdays and ending at noon two Tuesdays later. However, based on Metson's designation of the workweek as running from Monday to Sunday they received seventh-day overtime compensation for only one day of each 14-day hitch. Plaintiffs contend that premium pay must be calculated based on the "fixed and regular" schedule actually worked and that Metson should not be allowed to subvert the employee protections of section 510 by designating an artificial workweek that does not correspond with the period actually worked. Asserting that their workweek actually began and ended on Tuesday, plaintiffs argue that Metson was required to pay overtime wages for work performed on the seventh and 14th day of each hitch.

Section 500 undoubtedly affords an employer significant flexibility in the designation of a workweek. (See Dept. of Industrial Relations, Div. of Labor Standards Enforcement (DLSE),[3] mem. to All DLSE Professional

---

[3] The DLSE is the "state agency empowered to enforce California's labor laws." (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 561–562 [59 Cal.Rptr.2d 186, 927 P.2d 296].)

Staff (Dec. 23, 1999) <http://www.dir.ca.gov/dlse/AB60update.htm> [as of Apr. 14, 2011] ["Understanding AB 60: An In Depth Look at the Provisions of the 'Eight Hour Day Restoration and Workplace Flexibility Act of 1999' "; "An employer may designate the period of the . . . workweek"].) In its petition for rehearing, Metson for the first time has cited a wealth of material under California law and under federal law and the law of other states following federal law illustrating an employer's discretion to designate a workweek that differs from an employee's work schedule. As these materials indicate, employers may for bona fide business reasons establish an infinite variety of working schedules, including rotating and alternating schedules under which employees start at different times on different days. It apparently has been widely recognized that such schedules may entail employees working more than 40 hours in a calendar week or more than seven consecutive days without benefit of the overtime premium otherwise required if the workdays fall into more than one "workweek." For example, both the DLSE and the Department of Labor have for many years approved of the so-called 9/80 schedule, under which (as an example) employees work nine hours Monday through Thursday and eight hours on Friday of one week and nine hours Monday through Thursday of the second week—i.e., nine work days within two calendar weeks totaling 80 hours.[4] By designating the start of the "workweek" as mid-day on Friday, thereby placing four hours of that day into each workweek, the employee works no more than 40 hours in one workweek and no overtime premium is due. (DLSE Opn. Letter No. 1991.6.19 (June 19, 1991) ["Re: Use of 9/80 Schedule Under Wage Order 1-89"] <http://www.dir.ca.gov/dlse/opinions/1991-06-19-RS.pdf> [as of Apr. 14, 2011]; U.S. Dept. of Labor, Opn. Letter No. FLSA2009-16 (Jan. 16, 2009) <http://www.dol.gov/WHD/opinion/FLSA/2009/2009_01_16_16_FLSA.pdf> [as of Apr. 14, 2011].)[5] Similarly, the DLSE Enforcement Policies and Interpretations Manual provides the following example: "If an employee's workweek begins on Monday morning, but she is not called in to work until Wednesday to work seven consecutive 8-hour days, until Tuesday, she is not due any overtime. His or her workweek ends Sunday night and she has only worked 40 hours with no daily overtime Wednesday through Sunday. Monday begins a new workweek, and she could work 8-hour days through Friday without any overtime

---

[4] Such an alternative workweek schedule may be adopted with the approval of at least two-thirds of affected employees in a work unit pursuant to section 511 or pursuant to a collective bargaining agreement entered under section 514. In either case the requirements of section 510 do not apply. (§ 510, subd. (a)(1), (2).)

[5] Advisory opinions issued by the DLSE, " ' "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." ' " (*Bell v. Farmers Ins. Exchange* (2001) 87 Cal.App.4th 805, 815 [105 Cal.Rptr.2d 59]; see also *Morillion v. Royal Packing Co., supra*, 22 Cal.4th at p. 583.)

due, thus having worked 10 consecutive days without overtime." (DLSE, Enforcement Policies and Interpretations Manual (Mar. 2006 rev.) p. 48-2.)

Numerous cases from multiple jurisdictions brought to our attention by Metson uphold the denial of overtime based on the acceptance of a workweek differing from the schedule that the employee actually works. (E.g., *Oliver v. Centerpoint Energy, Inc.* (S.D.Tex. 2010) 2010 U.S.Dist. Lexis 52546; *Blasdell v. State of New York* (N.D.N.Y. 1992) 1992 U.S.Dist. Lexis 20921; *Calypso Ice Cream, Inc. v. Government of Virgin Islands* (D.C.V.I. 1967) 266 F.Supp. 412 [6 V.I. 202]; *Pappas v. The Kerite Co.* (Conn. C.P. 1949) 16 Conn.Supp. 190; *Barclay v. Magnolia Petroleum Co.* (Tex.Civ.App. 1947) 203 S.W.2d 626, 628 ["The right of the employer to establish a 'work week' seems to be well settled."]; *Harned v. Atlas Powder Co.* (Ct.App. 1946) 301 Ky. 517 [192 S.W.2d 378]; *Sloat v. Davidson Ore Mining Co.* (W.D.Mich. 1942) 71 F.Supp. 1010.)

Contrary to Metson's suggestion, however, these authorities do not stand for the proposition that an employer's authority to designate a workweek is unlimited. Under both federal and state labor laws, it is clear that an employer may not designate its workweek in a manner that is designed primarily to evade overtime compensation. The federal regulation states explicitly that the workweek may not be "designed to evade the overtime requirements of the [Fair Labor Standards] Act." (29 C.F.R. § 778.105 (2010).) Similarly, the DLSE Enforcement Policies and Interpretations Manual repeats that the workweek cannot be changed if "designed to evade overtime obligations." (DLSE, Enforcement Policies and Interpretations Manual, *supra*, at p. 48-1.) "The bottom line is this: An employer may not engage in a subterfuge or artifice designed to evade the overtime laws." (*Huntington Memorial Hospital v. Superior Court* (2005) 131 Cal.App.4th 893, 910 [32 Cal.Rptr.3d 373].)

In *In re Wal-Mart Stores, Inc.* (N.D.Cal. 2007) 505 F.Supp.2d 609, 617–618, the court held that the plaintiffs had properly alleged a claim for failure to pay overtime in violation of sections 500 and 510 where the complaint alleged that " 'when [the plaintiff] worked a graveyard shift, Wal-Mart would count the hours worked before midnight as working one day, and all the hours worked after midnight as hours worked on another day, thereby denying [him] overtime pay.' " (505 F.Supp.2d at p. 616.) The court's opinion includes no suggestion of any reason for the employer's policy other than to avoid the payment of overtime. The court concluded that the employer's practice was contrary to the plain language of the statute. The court explained, "the first sentence of Labor Code section 510(a) bluntly states: 'Eight hours of labor constitutes a day's work.' In the context of an overtime statute, this sentence clearly conveys the legislature's intent that,

other than in the case of specific enumerated exceptions, a shift of more than eight hours of consecutive work qualifies for overtime pay. California's overtime laws are remedial and are to be construed so as to promote employee protection." (505 F.Supp.2d at p. 617.)

Based on the facts before the court in this case when it granted summary judgment, Metson's definition of the workweek appears as an attempt to evade the requirements of sections 500 and 510 no different from the method disapproved in the *Wal-Mart* case. Nothing in the record suggests that the designation of the workweek was designed to serve a legitimate business purpose or any purpose other than the avoidance of the obligation to pay overtime wages. Metson has not presented any evidence that it has created an alternating or variable work schedule to accomplish some bona fide business objective or to accommodate employee preferences. Nor is this a situation where because of circumstances affecting an individual employee's availability or the employer's needs the employee reported to work on a particular occasion in the middle of a designated workweek. Rather, for all employees working aboard its vessels Metson has established a single work schedule that begins on a Tuesday, while designating the "workweek" to begin on a Monday, accomplishing nothing apparent in the record other than the elimination of overtime. Metson asserts for the first time in its petition for rehearing that it has other employees, such as office employees, who work a more conventional schedule. Metson's separate statement of material facts in support of its motion for summary judgment includes no such information, much less did Metson make a showing that there is any good reason for designating the same workweek for its employees who work aboard ship and any office employees it may have.[6] The only evidence before the court supports no inference other than that the workweek designation was designed primarily, if not solely, to reduce overtime compensation.

Of the many cases cited by Metson, those that address this issue confirm that an employer may designate a workweek used to calculate compensation that differs from the work schedule of its employees only if there is a bona fide business reason for doing so, which does not include the primary objective of avoiding the obligation to pay overtime. For example, in *Blasdell v. State of New York, supra,* 1992 U.S.Dist. Lexis 20921, the court held that the employer had not violated the FLSA by designating a workweek that began on Tuesday rather than Sunday. The court pointed out that the nature of plaintiff's employment required "that members of the group be on

---

[6] The definition of a "workweek" under the FLSA expressly contemplates that "a single workweek may be established for a plant or other establishment as a whole or different workweeks may be established for different employees or groups of employees." (29 C.F.R. § 778.105 (2010).) Similarly, the DLSE Enforcement Policies and Interpretations Manual, at page 48-1, recognizes that "[a]n employer may establish different workweeks for different employees."

duty continuously" and that the "rotating shift schedule" in question had been implemented "[i]n an effort to provide such coverage." (*Blasdell*, at p. *4.)[7] In *Sloat v. Davidson Ore Min. Co., supra*, 71 F.Supp. 1010, the employer utilized a workweek beginning on Monday with respect to employees who under an alternating three-day work schedule began work on Thursday. The court made a finding of fact that the alternating schedule was instituted at the request of the employees so that all of the affected employees would have off every other weekend. In *Calypso Ice Cream, Inc. v. Government of the Virgin Islands, supra*, 266 F.Supp. 412, the court held that no overtime was owed to employees who worked 10 consecutive days but not more than five days in a workweek defined as beginning at Friday morning at midnight. The court found explicitly that "[t]he employer did not establish the above-described schedule to evade the overtime requirements of the law." (*Id.* at p. 415.) In *Oliver v. Centerpoint Energy, Inc., supra*, 2010 U.S.Dist. Lexis 52546, the court held that a rotating work schedule under which an employee's regularly scheduled work days differed over three successive weeks but included 10 consecutive days spanning two workweeks and thus giving rise to no overtime did not violate the FLSA. The designated workweek differed from the pay period used to calculate overtime but this workweek, beginning at midnight on Friday, was specified in a collective bargaining agreement and, as the court held, there was no evidence that the employer "initiated its Saturday to Friday workweek to evade the FLSA's overtime requirements." (*Oliver*, at p. *19.) In *Pappas v. The Kerite Co., supra*, 16 Conn.Supp. 190, the court held there was no right to overtime under the FLSA where the prevailing workweek for the entire factory was based on daytime employees' Monday to Monday schedule but the plaintiff worked an alternating schedule of seven nights on and seven night off beginning on Thursdays. The court pointed out explicitly that there was "no subterfuge employed to defeat plaintiff's right to overtime pay." (*Pappas*, at p. 192.) In *Allen v. Gonzales Consulting Services, Inc.* (W.D.Mich. 2011) 2011 U.S.Dist. Lexis 4916, the court upheld the denial of overtime to an employee working under a "compressed workweek" schedule in which the workweek began in the middle of one of his shifts. The court granted summary judgment to the employer based upon a declaration from the employer attesting that the company "operates 24 hours a day, 7 days a week and implemented the compressed workweek schedule in order to comply with its obligation as a federal contractor to ensure that at least one supervisor is on duty at all times." (*Id.* at p. *6.)

---

[7] Under the employer's rotating shift schedule, employees worked various shifts throughout the week and received different days off each week depending upon their specific schedule. (*Blasdell v. New York, supra*, 1992 U.S.Dist. Lexis 16708 at pp. *4–*5.) The court noted that while starting the workweek on Sunday presumably would have resulted in additional compensation for some employees, it would also have had the opposite effect for other employees. (*Id.* at p. *4, fn. 1.)

■  Here, as indicated above, the undisputed evidence raises a reasonable inference that Metson designated its workweek in a manner primarily designed to evade its overtime obligations and Metson failed to rebut that inference. Hence, the order summarily adjudicating this issue adverse to plaintiffs must be reversed because Metson did not establish that plaintiffs were properly denied a second seventh-day premium during each 14-day hitch.

### B.  *"Off-duty Standby" Hours*

#### (1)  *Hours worked*

■  Plaintiffs also contend that they were entitled to additional compensation for on-call hours worked in the course of their 14-day hitches. The parties agree that Metson's obligation to compensate plaintiffs for 12 hours of "off-duty standby" time each day is governed by wage order No. 9-2001 issued by the Industrial Welfare Commission (IWC), codified in California Code of Regulations, title 8, section 11090 (hereafter wage order No. 9).[8] This wage order requires an employer to compensate its employees for all "hours worked" and, subject to various other provisions and conditions not here relevant, to pay specified overtime rates for "hours worked" in excess of eight or 12 hours per day. The definition of "hours worked" appears in subdivision 2(G) of wage order No. 9, which provides: " 'Hours worked' means the time during which an employee is *subject to the control of an employer*, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." (Italics added.) Plaintiffs argue that they are entitled to overtime compensation for the 12 hours they were on "stand by" each day because the restrictions Metson imposed during that time period subjected them to Metson's continued control.

."Whether and to what extent employees are able to use on-call time for personal activities is a question of fact. [Citations.] However, whether the limitations on the employees' personal activities while on-call are such that on-call waiting time would be considered compensable . . . is a question of law which we review *de novo*." (*Berry v. County of Sonoma* (9th Cir. 1994) 30 F.3d 1174, 1180; see *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785,

---

[8] The IWC, which "is the state agency empowered to formulate regulations (known as wage orders) governing employment in the State of California" (*Tidewater Marine Western, Inc. v. Bradshaw, supra,* 14 Cal.4th at p. 561), has promulgated 15 orders covering specific industries and occupations. Wage order No. 9 applies to the transportation industry. All wage orders contain the same definition of "hours worked" except for two wage orders not applicable here (discussed at pp. 376–377, *post*) which contain additional language. (See *Morillion v. Royal Packing Co., supra,* 22 Cal.4th 575, 581; *Aguilar v. Association for Retarded Citizens* (1991) 234 Cal.App.3d 21, 25 [285 Cal.Rptr. 515].)

794 [85 Cal.Rptr.2d 844, 978 P.2d 2].) Hence, we employ a de novo standard of review in determining whether the restrictions on plaintiffs' personal activities, as established by the undisputed facts, are such that the standby time should be regarded as hours worked within the meaning of wage order No. 9.

In *Morillion v. Royal Packing Co., supra*, 22 Cal.4th at page 587, our Supreme Court explained that "[t]he level of the employer's control over its employees, rather than the mere fact that the employer requires the employees' activity, is determinative" of whether particular hours constitute "hours worked." Applying this rule, the court held that time spent in transit by agricultural employees required by their employer to travel to and from the field on employer-provided buses constituted "hours worked." The court rejected the argument that "plaintiffs were not under [the employer's] control during the required bus ride because they could read on the bus, or perform other personal activities." (*Id.* at p. 586.) The court explained, "Permitting plaintiffs to engage in limited activities such as reading or sleeping on the bus does not allow them to use 'the time effectively for [their] own purposes.' [Citation.] As several amici curiae observe, during the bus ride plaintiffs could not drop off their children at school, stop for breakfast before work, or run other errands requiring the use of a car. Plaintiffs were foreclosed from numerous activities in which they might otherwise engage if they were permitted to travel to the fields by their own transportation. Allowing plaintiffs the circumscribed activities of reading or sleeping does not affect, much less eliminate, the control [the employer] exercises by requiring them to travel on its buses and by prohibiting them from effectively using their travel time for their own purposes." (*Ibid.*)

Factors to consider in evaluating the level of control exerted by the employer include: " '(1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.' " (*Gomez v. Lincare, Inc.* (2009) 173 Cal.App.4th 508, 523 [93 Cal.Rptr.3d 388] (*Gomez*), quoting *Owens v. Local No. 169* (9th Cir. 1992) 971 F.2d 347, 351; see also *Berry v. County of Sonoma, supra*, 30 F.3d 1174, 1183.)[9]

---

[9] A similar multifactor analysis has been applied in a number of advice letters issued by the DLSE. (*Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1535 [87 Cal.Rptr.3d 518]; see DLSE Opn. Letter No. 1998.12.28 (Dec. 28, 1998) ["Compensability of Resident

It is undisputed that Metson allocated eight hours of the 12 hours of off-duty standby time for sleeping, and required plaintiffs to sleep aboard ship during their 14-day hitches. With respect to the remaining four hours of the 12 off-duty standby hours, plaintiffs were subject to a response time requirement that effectively placed a geographic restriction on their activities during that period. "As a practical matter, if an employee is not required to remain on the employer's premises, geographical restrictions are imposed according to the required response time for an employee to return to the employer's premises. [Citations.] In such cases, the employee while on-call may only travel that distance from the employer's premises which can be traveled safely within the required response time." (*Berry v. County of Sonoma*, 30 F.3d at p. 1185.) The undisputed evidence here establishes that if plaintiffs left their ship during their standby time, they needed to be able to return to the ship within at most 45 minutes.

Considering only the four hours not designated as a period for sleep, some of the factors articulated in the federal *Owens* decision and embraced in *Gomez* point to employer control, while other factors militate in favor of the opposite conclusion. During those four hours plaintiffs were free to pursue whatever activities they chose, so long as they did not consume alcohol and could safely return to the ship within the prescribed time. The required response time (and perhaps the alcohol ban) precluded plaintiffs from going places and pursuing activities in which they might otherwise have engaged. (Cf. *Madera Police Officers Assn. v. City of Madera* (1984) 36 Cal.3d 403 [204 Cal.Rptr. 422, 682 P.2d 1087] [constraints placed on activities and conduct of police officers during mealtimes converted that time into hours worked].) Nonetheless, plaintiffs were free to pursue recreational activities of their choice aboard ship, such as reading, watching television or using the Internet, and they could and did leave the ship to exercise and run personal errands. Moreover, the undisputed evidence is that emergencies were rare and that plaintiffs were seldom called back to the ship during their off-duty standby hours.

Metson cites a number of cases in which courts have concluded that on-call employees able to engage in such personal activities and subject to even shorter response time requirements were not entitled to compensation. (See *Gomez, supra,* 173 Cal.App.4th 508 [30-minute telephone response time]; *Dinges v. Sacred Heart St. Mary's Hospitals* (7th Cir. 1999) 164 F.3d 1056 [seven-minute response time]; *Bright v. Houston Northwest Medical Center Survivor, Inc.* (5th Cir. 1991) 934 F.2d 671 [20-minute response

Apartment Managers' 'On-Call Time' "] <http://www.dir.ca.gov/dlse/opinions/1998-12-28.pdf> [as of Apr. 14, 2011]; DLSE Opn. Letter No. 1993.03.31 (Mar. 31, 1993) [" 'On-Call' Time—Beepers"] <http://www.dir.ca.gov/dlse/opinions/1993-03-31.pdf> [as of Apr. 14, 2011].)

time].) However, there is one critical difference between each of those cases and the present situation—in none of those cases was the employee required to sleep at the employer's premises. In *Bright*, the court observed that the situation there was "wholly different" from cases in which employees were required to serve their on-call time at the employer's premises because "Bright did not have to remain on or about his employer's place of business, or some location designated by his employer, but was free to be at his home or at any place or places he chose, without advising his employer, subject only to the restrictions that he be reachable by beeper, not be intoxicated, and be able to arrive at the hospital in 'approximately' twenty minutes." (934 F.2d at p. 676.)

■ Except with respect to certain occupations in which the employee resides on the premises, covered by a different wage order, California courts have consistently held that an employee required to sleep at the worksite is subject to the employer's control during sleeping hours. (*Aguilar v. Association for Retarded Citizens, supra*, 234 Cal.App.3d at p. 30 ["broad definition [of 'hours worked'] clearly includes time when an employee is required to be at the employer's premises and subject to the employer's control even though the employee was allowed to sleep"]; *Monzon v. Schaefer Ambulance Service, Inc., supra*, 224 Cal.App.3d at p. 50 (conc. & dis. opn. of Johnson, J.) ["An ambulance driver who is sleeping in a designated sleeping area . . . is definitely 'subject to the control of the employer' [so that] in the absence of some specific exception . . . his or her sleep and mealtime counts as 'hours worked' under the California rules."]; cf. *Bono Enterprises, Inc. v. Bradshaw* (1995) 32 Cal.App.4th 968, 974–975 [38 Cal.Rptr.2d 549], disapproved on other grounds in *Tidewater Marine Western, Inc. v. Bradshaw, supra*, 14 Cal.4th at p. 574 [upholding DLSE enforcement policy treating as hours worked meal periods during which employee is required to remain at the worksite].)

Metson disputes this conclusion, arguing that under *Isner v. Falkenberg/Gilliam & Associates, Inc.* (2008) 160 Cal.App.4th 1393 [73 Cal.Rptr.3d 433] and *Brewer v. Patel* (1993) 20 Cal.App.4th 1017 [25 Cal.Rptr.2d 65], when the nature of the job requires the employee to sleep at the worksite and the employee must merely remain available for emergencies without performing any other services during off-duty hours, the off-duty standby hours do not constitute hours worked for compensation purposes. However, both of those cases involve employees who reside on the premises—an apartment manager and a hotel clerk—whose compensation is governed by wage order No. 5-2001, governing the public housekeeping industry. (Cal. Code Regs., tit. 8, § 11050.) The definition of "hours worked" in that wage order begins, as does wage order No. 9, "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required

to do so." But unlike the definition in wage order No. 9, wage order No. 5-2001 continues, "and in the case of an employee who is required to reside on the employment premises, that time spent carrying out assigned duties shall be counted as hours worked." (Cal. Code Regs., tit. 8, § 11050, subd. 2(K).) Metson acknowledges the difference in the definition of "hours worked" under the two wage orders, noting that it "is not asking this court to abandon the 'control test' in favor of the narrow definition of 'hours worked,' as set forth in Wage Order 5." Instead, Metson "offers these legal authorities as guidance in analyzing the 'nature of employment' factor of the control test." "[G]iven the emergent nature of [plaintiffs'] employment, which rendered residing aboard ship reasonable," Metson argues, "the limited control Metson maintained over crewmembers during the 12-hour off-duty standby period was also reasonable" and requiring it to compensate the employee for such an off-duty period would have "a serious negative impact" on its business.

However, the nature of the employment and the reasonableness of the requirement that employees sleep at the worksite are not relevant to the determinative issue of control. In asserting that these issues are relevant, Metson relies on the 1993 DLSE advisory opinion letter, cited *ante*, footnote 9. (DLSE Opn. Letter No. 1993.03.31.) This advisory letter does include "the nature of the employment" as an additional factor to consider.[10] However, the letter does not cite any statutory or other authority for considering this factor, which is at odds with the control test approved by the California Supreme Court in *Morillion v. Royal Packing Co., supra*, 22 Cal.4th 575. Moreover, the factor is not included in the later 1998 advisory letter in which the DLSE approved the factors applied in *Gomez, supra*, 173 Cal.App.4th 508. (DLSE Opn. Letter No. 1998.12.28.) Thus, assuming that the restrictions imposed by Metson on its employees, including the on-board sleeping requirement, are in fact reasonable in light of the nature of the services Metson provides, hours during which the employees remain under the substantial control of Metson nonetheless constitute hours worked. Such control unquestionably exists during hours that employees are required to sleep aboard ship.[11]

---

[10] The letter states, "A reasonable and long-standing industry practice which clearly indicates that workers in the affected classifications are expected to be on-call and that depriving the employer of the right to require uncompensated on-call status of the workers in this category will have a serious negative impact on the employer's business will be considered in [determining whether on-call time qualifies as hours worked]." (DLSE Opn. Letter No. 1993.03.31, *ante*, fn. 9.)

[11] While Metson may not insist that its employees in fact sleep eight hours each night, that is the number of hours assigned to sleep time and no party questions considering eight hours as the number of hours during which plaintiffs were required to sleep aboard ship during their 14-day hitches.

Metson also relies on two federal cases involving similar residency requirements in which the court found sleep time not compensable working hours. In *Allen v. Atlantic Richfield Co.* (5th Cir. 1984) 724 F.2d 1131, guards at a plant under strike from early January to the end of March were required to remain at the plant 24 hours a day, during 12 of which they were on duty, and during the other 12 of which they "were free to sleep, eat at no expense, watch movies, play pool or cards, exercise, read, or listen to music." (*Id.* at p. 1137.) The employees were not compensated for this off-duty time except on the infrequent occasions that their off-duty time was interrupted. (*Id.* at p. 1134.) The court upheld a judgment in favor of the employer on the ground that the evidence supported the jury's findings that "time spent on off-shift status inside the refinery was not work time . . . [and] that there was an agreement between Arco and the guards that the off-shift time of the guards during the strike would not be work or compensable time." (*Ibid.*)

In *Rousseau v. Teledyne Movible Offshore, Inc.* (5th Cir. 1986) 805 F.2d 1245, 1247, the employees worked "on a 'hitch' basis, spending seven full days working and living on the barges and then seven full days not working or living on the barges." They were paid for 12 hours each day. During the other 12 hours they were required to remain on the barges but " 'were free to sleep, eat, watch television, watch VCR movies, play pingpong or cards, read, listen to music, etc.' " (*Id.* at p. 1248.) The evidence admitted at trial established that while "each derrick barge employee was in fact subject to being called to work, if circumstances required . . . , the experiences of individual plaintiffs demonstrate that they were either never, seldom, or infrequently called upon to perform job duties after they had been released from the day's work and before their next day's work began, particularly when the barges were docked and are not working." (*Rousseau v. Teledyne Movible Offshore, Inc.* (W.D.La. 1985) 619 F.Supp. 1513, 1516.) The evidence also established that "[t]he reasons for the [no-leave] policy at dockside were several, including liability and safety concerns, a desire to avoid having to take disciplinary action due to employees drinking and related rule violations, and the desire and need to remain in a 'movable' status with a full crew aboard." (*Id.* at pp. 1516–1517.) On appeal, the court upheld the trial court's finding that the time the employee spent on the barges not actively working was not time spent primarily for the benefit of the employer. (*Rousseau, supra,* 805 F.2d at p. 1248.) The court explained, "the record indicates that the employees actually benefited from the no leave policy, at least potentially. By remaining on the barges during the off duty times, the employees could take advantage of any jobs that might come up on short notice, with the accompanying possibility of overtime work. In short, any benefits derived by Teledyne from the no leave policy do not, on these facts, create a claim for compensable time." (*Id.* at pp. 1248–1249.)

■ Both *Allen* and *Rousseau* were decided under the provisions of the FLSA. "California's wage orders are closely modeled after (although they do not duplicate), section 7(a)(1) of the [FLSA]." (*Monzon v. Schaefer Ambulance Service, Inc., supra*, 224 Cal.App.3d at p. 38.) "Given the similar purpose behind FLSA and the wage orders, . . . although the definitions of 'hours worked' are not the same, they are parallel, and therefore federal precedent is entitled to some deference." (*Id.* at p. 46; see also *Huntington Memorial Hospital v. Superior Court, supra*, 131 Cal.App.4th at p. 910.) Nevertheless, the California Supreme Court has repeatedly stressed the "recognized principle that state law may provide employees greater protection than the FLSA." (*Morillion v. Royal Packing Co., supra*, 22 Cal.4th at p. 592; see also *Ramirez v. Yosemite Water Co., supra*, 20 Cal.4th at p. 795 ["IWC's wage orders, although at times patterned after federal regulations, also sometimes provide greater protection than is provided under federal law in the Fair Labor Standards Act . . . ."].) The court has "recognized that 'past decisions additionally teach that in light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed with an eye to promoting such protection.' " (*Morillion, supra*, at p. 592.) To the extent that the federal cases apply a more restrictive definition of hours worked or rely on factors not relevant to the control test, those cases have little persuasive value in deciding whether the time periods in question here constitute hours worked.

DLSE advisory opinions emphasize that federal decisions are not persuasive authority insofar as the federal courts "consider the existence and provisions of any agreement between the parties governing the compensability of on-call work." (DLSE Opn. Letter No. 1998.12.28, *supra*, at p. 4, fn. 3; see DLSE Opn. Letter No. 1993.03.31, *supra*, at p. 3.) The December 1998 opinion letter explains that "this factor does not really address the extent of the employer's control over the employee and as such, is not relevant to a determination of compensability under California law." (DLSE Opn. Letter No. 1998.12.28, *supra*, at p. 4, fn. 3; see also *Ghazaryan v. Diva Limousine, Ltd., supra*, 169 Cal.App.4th at p. 1535, fn. 10 [noting DLSE's refusal to defer to federal authority with respect to analysis of whether on-call time constitutes "hours worked" "because, under California law 'the existence of an "agreement" regarding the understanding of the parties (as to the compensation policy) is of no importance. The ultimate consideration in applying the California law is determining the extent of the "control" exercised.' "].)

The decision in *Allen* is thus distinguishable based largely on the fact that the employees there had negotiated an agreement with their employer in advance of the strike under which they were paid at a higher hourly rate for

hours worked during the strike in exchange for the 24-hour residency requirement. (*Allen v. Atlantic Richfield Co., supra*, 724 F.2d at p. 1134.) The employees thus did receive additional compensation for the extra hours spent on the premises. Moreover, no such agreement exists here and, as just noted, the existence of such an agreement would not in any event be relevant to a determination of hours worked under California law.[12] *Rousseau* too is of little persuasive value based on findings that cannot be made in this case and on a criterion that does not apply under California's standard. While the court in *Rousseau* found that the on-board sleeping requirement was not primarily for the benefit of the employer, in the present case the undisputed evidence establishes that the residential and standby requirements were imposed solely because of the nature of Metson's business, which was to provide emergency cleanup of oil spills and other environmentally hazardous discharges. As Metson recognizes, the nature of its business requires its employees to be ready to respond to an emergency on short notice. There is no suggestion that the standby requirement was designed in any way for the benefit of the employees. Moreover, insofar as the reasoning in *Rousseau* conflicts with the well-established California law that an employee required to sleep at his employer's premises is under the control of his employer, it is of little persuasive value.

Thus, the degree of control exercised by requiring the employees to sleep aboard ship, which is not their residence, renders the eight sleep time hours "hours worked" under California law. The fact that plaintiffs were required to spend their sleeping hours aboard ship also bears on the appropriate characterization of the additional four hours per day of standby time. While the balance of factors specified in *Gomez* might otherwise lead to the conclusion that those four hours are not under the employer's control, the fact that the employees must under all circumstances return to the ship to sleep tips the balance in the other direction. The on-board sleep requirement significantly affects and limits what the employee can and cannot do during the four nonsleeping hours. (*Bright v. Houston Northwest Medical Center Survivor, Inc., supra*, 934 F.2d at p. 676.) Viewing the entire 12-hour off-duty standby period as a whole, the restrictions placed on plaintiffs' whereabouts significantly restricted their ability to pursue activities of their choice. (See *Madera Police Officers Assn. v. City of Madera, supra*, 36 Cal.3d at p. 411 ["The courts, in evaluating the employee's claims, must examine the restrictions cumulatively to assess their overall effect on the worker's noncompensatory time."].)

---

[12] While an agreement between the parties is not relevant to whether on-call time should be considered "hours worked," under limited circumstances an employer and employee may agree to exclude from compensable hours sleep time that otherwise qualifies as "hours worked." (See discussion, *post.*)

Moreover, there is an additional factor to consider. The failure to analyze the 12 hours as a whole would produce an absurd result. As discussed more fully *post*, an employer may agree with a 24-hour employee to exclude eight hours of sleep time per day from compensable hours. Such an agreement is not permissible if the employee works less than 24 hours a day. (*Aguilar v. Association for Retarded Citizens, supra*, 234 Cal.App.3d at pp. 31, 33 [exemption for sleep time applies only to 24-hour employees].) Thus, considering the entire 12 hours as hours worked leads to the ultimate conclusion that the employees are entitled to compensation for the four nonsleeping hours of the 12 off-duty standby hours. If, on the other hand, the four hours of nonsleep time were not considered as hours worked, the employees would be entitled to be compensated for eight of the off-duty standby hours, the eight sleeping hours. Such a result would be entirely nonsensical and provides another reason for considering the entire 12-hour period to constitute hours worked.

### (2) *Compensability*

Although the 12 off-duty hours of each day during plaintiffs' 14-day hitch constitute hours worked within the meaning of the wage order, it does not necessarily follow that plaintiffs were entitled to be compensated for each of those hours. In *Monzon v. Schaefer Ambulance Service, Inc., supra*, 224 Cal.App.3d at page 46, the court recognized that a maximum of eight hours a 24-hour employee spends sleeping at the employer's premises may be excluded from compensation by prior agreement. The court held that "it is permissible for an employer and [employees] to enter into an agreement, which need not be written, to exclude up to eight hours of sleep time from work or compensable time on twenty-four-hour shifts if adequate sleeping facilities are provided by the employer and the employee has the opportunity to get at least five hours of uninterrupted sleep." (*Ibid.*)

Plaintiffs argue unpersuasively that an agreement such as recognized in *Monzon* is effective only with respect to ambulance drivers and attendants. Plaintiffs are correct that wage order No. 9 provides an exemption for ambulance drivers and attendants who have agreed in writing to exclude from compensation eight hours of sleep in a 24-hour period. (Cal. Code Regs., tit. 8, § 11090, subd. 3(K).) Nonetheless, the court held that this exemption was not applicable in that case because there was no written agreement. (*Monzon v. Schaefer Ambulance Service, Inc., supra*, 224 Cal.App.3d at pp. 40–41.)

Instead, recognizing that the DLSE's "enforcement policy for sleep time closely resembles the federal policy," the court read into the state regulation defining compensable hours worked the provisions of the federal regulation, 29 Code of Federal Regulations part 785.22 (2010). The federal measure provides that when an employee works 24 hours or more, the employer and the employee may agree to exclude a " 'regularly scheduled sleeping period of not more than 8 hours . . . provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep.' " (*Monzon*, at pp. 41–42, italics omitted.) The court explained that the explicit exemption in the regulation for a sleep time exclusion that applies only to ambulance drivers and attendants and requires a written agreement provides an exclusion only from the daily overtime requirement in the wage order. That explicit exemption is not the source of the more general sleep time exclusion; the exclusion of sleep time from compensable hours worked by 24-hour employees is implied from the terms of the federal regulation. (*Id.* at p. 46.) The court held that "since an agreement to exclude sleep time from compensable time is an exception to the requirement that employees be paid for 'hours worked,' it is the burden of the employer to prove that an agreement exists and what the terms of the agreement are." (*Ibid.*) In the 20 years since *Monzon* was decided, no judicial decision brought to our attention has disagreed with its ruling and neither the statute nor the regulations have been amended to modify the ruling. (See *Aguilar v. Association for Retarded Citizens, supra*, 234 Cal.App.3d at pp. 31, 33.)

As noted above, Metson allocated eight hours of unpaid time a day for sleep. The undisputed facts establish that sleeping facilities were provided for employees on the ships, and that it was exceptionally rare for their sleep to be interrupted by an emergency. The undisputed facts also establish an implied agreement between the parties that plaintiffs would not be compensated for eight hours of sleep time so long as their sleep was not interrupted. Prior to their employment, plaintiffs received a handbook that set forth Metson's compensation policies, including that employees would not be compensated for eight hours of "off-duty" sleep time each day. Plaintiffs did not dispute that they were "aware of and worked for [Metson] pursuant to the pay structure set forth in [Metson's] employee handbook."

Thus, while plaintiffs were entitled to be compensated for only four, rather than 12, hours of standby time during each 24-hour working day, the summary judgment in favor of Metson must be reversed also because plaintiffs are entitled to be compensated for those four-hour periods.

In reaching this conclusion, we neither agree nor disagree with Metson's contention that the exclusion of the entire 12 off-duty standby hours from "hours worked" would be reasonable in light of the nature of its business, and that requiring it to compensate employees for any of these hours (at overtime rates, no less) will negatively impact its business and may adversely affect employees by leading to the reduction of the number of crewmembers or hourly rates of compensation. Our task is to interpret and enforce the applicable wage order that has been properly adopted by the IWC. The several wage orders that have been promulgated by the IWC are tailored to the conditions of the different industries to which each applies, and within the wage orders themselves are numerous qualifications and exceptions to reflect more unique situations within the scope of the order that make different treatment appropriate. If the nature of providing emergency maritime cleanup services is such as to justify an exception from the normal control standard governing the determination of "hours worked," that is a matter to be evaluated by the IWC. The existing wage order contains no such exception. It is not for the court to determine whether such an exception would be appropriate, but Metson's contentions may well deserve the careful consideration of the IWC.

## 2. *Plaintiffs' Motion for Summary Adjudication*

Plaintiffs' motion sought summary adjudication of the following issues: "1. That California wage and hour laws apply; 2. That plaintiffs were under the control of the defendants for the entire two-week 'hitch'; 3. That the defendants failed to provide duty free meal periods; and 4. That the defendants failed to properly calculate overtime for the seventh consecutive day worked pursuant to California wage and hour laws." In the trial court, Metson objected to plaintiffs' motion on procedural as well as substantive grounds and the trial court agreed that the motion should be denied on both grounds. On appeal, Metson renews its contention that the motion is not proper because plaintiffs do not seek to summarily adjudicate "one or more causes of action within an action, one or more affirmative defenses, one or more claims for damages, or one or more issues of duty" as authorized by Code of Civil Procedure section 437c, subdivision (f)(1). Plaintiffs have not responded to this procedural deficiency nor do they challenge the court's ruling denying the motion on this procedural ground. We agree that the motion was properly denied on this ground. We shall therefore affirm the denial of the summary adjudication motion on this procedural ground, without implying any qualification of the substantive rulings expressed above.

## Disposition

The judgment is reversed and remanded to the trial court with directions to proceed in accordance with the views expressed in this opinion. Plaintiffs are to recover their costs on appeal.

Siggins, J., and Jenkins, J., concurred.

Respondents' petition for review by the Supreme Court was denied July 27, 2011, S193330. Werdegar, J., did not participate therein.