Filed 7/3/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| TIM MENDIOLA et al.,<br><br>    Plaintiffs, Cross-defendants<br>    and Respondents,<br><br>        v.<br><br>CPS SECURITY SOLUTIONS, INC.,<br>et al.,<br><br>    Defendants, Cross-complainants<br>    and Appellants. | B240519<br>(Los Angeles County<br>Super. Ct. No. BC388956 c/w<br>BC391669) |

        APPEAL from an order of the Superior Court of Los Angeles County.  Jane L. Johnson, Judge.  Reversed in part and affirmed in part, with directions.

        Blank Rome and Howard M. Knee; Jim D. Newman for Defendants, Cross-complainants and Appellants.

        Law Offices of Cathe L. Caraway-Howard for Plaintiffs, Cross-defendants and Respondents.

Appellants CPS Security Solutions, Inc., CPS Construction Protection Security Plus, Inc. and Construction Protective Services, Inc. (collectively "CPS") provide security guards for building construction sites throughout California. A number of the security guards employed by CPS are designated "trailer guards." They are thus described because in addition to their regular patrols, they are expected to spend the night at their assigned jobsites in CPS-provided residential-type trailers, in order to be available to investigate alarms and other suspicious circumstances and to prevent vandalism and theft. During these nighttime periods, CPS considers the trailer guards "on call," and generally compensates them only for the time spent actively conducting investigations.[1] In 2008, two lawsuits were filed against CPS, alleging violations of California law governing minimum wage and overtime compensation and seeking to represent the same class of California trailer guards. The trial court consolidated the cases and certified the class.[2]

Currently on appeal is the court's order granting a preliminary injunction requiring CPS to compensate trailer guards for all on-call time spent in the trailers. At issue are two distinct periods: weekdays, when the trailer guards are on patrol eight hours and on call eight hours, and weekends, when they are on patrol 16 hours and on call eight hours. We conclude that CPS must compensate the trailer guards for the nighttime hours spent on the jobsites during the week, as the trial

---

[1]    There are limited exceptions, as will be explained below.

[2]    The class was defined as "[a]ll persons who are or were employed as 'Trailer Guards' (also known as 'In-Residence Security Officers') on an hourly basis by [CPS], within the State of California, during the period of time from April 11, 2004 to the date of judgment, who, because of a company[-]wide policy concerning [o]n-[c]all time for Trailer Guards, were not compensated for [o]n-[c]all time spent at the trailer site." There are 1,725 members of the certified class who did not opt out of the lawsuit. Respondents Tim Mendiola, Policarpio Mas, Rodolfo Tablang, Floriano Acosta, Emmanuel Gonzaga, and Rogelio Rombaoa, the plaintiffs in the consolidated actions, were appointed class representatives. (Respondents will be referred to as "the Class.")

2

court ruled.  However, in accordance with settled principles of California law, we conclude that CPS is permitted to deduct eight hours for sleep time on those weekend days when the trailer guards are on duty for 24 hours.  Accordingly, we affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Complaints and Cross-Complaint*

The operative complaint sought damages for failure to pay minimum wage and overtime compensation in violation of California regulations and Labor Code provisions, including Wage Order No. 4.[3]  It also asserted other related claims, including a claim for declaratory relief, seeking a determination whether CPS's on-call compensation policy was unlawful under the applicable statutes and regulations.  CPS cross-claimed for declaratory relief, also seeking a judicial determination of the lawfulness of its on-call policy.

---

[3]     As will be discussed in greater detail, wage and hour claims are "governed by two complementary and occasionally overlapping sources of authority:  the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the [Industrial Welfare Commission (IWC)]."  (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1026.)  The IWC, a state agency, was authorized by the Legislature and the California Constitution to formulate regulations, known as wage orders, which establish minimum wages, maximum hours and standard conditions of employment for the various industries and occupations in the state.  (*Ibid*.; *Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1084, abrogated in part on other grounds in *Martinez v. Combs* (2010) 49 Cal.4th 35; *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 701; Cal. Const., art. XIV, § 1.)  Although the IWC was defunded in 2004, its wage orders remain in effect.  (*Gonzalez v. Downtown LA Motors, LP* (2013) 215 Cal.App.4th 36, 43; *California Correctional Peace Officers' Assn. v. State of California* (2010) 188 Cal.App.4th 646, 651.)  Wage Order No. 4 is more formally referred to as "Wage Order No. 4-2001," but we adopt the nomenclature used by the parties for this and all other specific wage orders discussed herein.

B. *Cross Motions for Summary Adjudication*

1. *Stipulated Facts Concerning Trailer Guards*

The parties filed cross-motions for summary adjudication on the declaratory relief causes of action, filing a joint statement of undisputed facts in which they stipulated to the following: CPS contracts with its customers, construction companies at building sites throughout California, to provide security services. The package of services generally includes the presence of a security guard from 3:00 p.m. to 7:00 a.m., Monday through Friday, and for 24 hours on Saturday and Sunday.[4]

Prior to being hired by CPS, each trailer guard was required to sign a "Designation of Personal Time for In-Residence Guard," also referred to as an "On-Call Agreement[]." The On-Call Agreements designated eight hours per day, generally from 9:00 p.m. to 5:00 a.m., as "On-Call" hours. Under these Agreements, each trailer guard agreed that the trailer home was his or her "residence," and agreed to "reside during [his or her] employment in the trailer home provided by the Company for [his or her] exclusive use." Those prospective hires who did not agree to the terms and conditions of employment as a trailer guard were offered positions as hourly guards, when available.

The trailers provided by CPS ranged in size from 150 to 200 square feet. The trailers had many of the amenities of home, including a living area, a bed, a functioning bathroom and kitchen, heat, and air conditioning. The trailers were equipped with locks, and only the assigned trailer guard and CPS maintenance staff

---

[4] The parties stipulated that "CPS's business model is based on the idea that construction sites should have an active security presence during the morning and evening hours when construction workers arrive and depart the site, but that theft and vandalism during the night and weekend hours can be deterred effectively by the mere presence of a security guard in a residential trailer."

had the keys. Trailer guards were allowed to keep personal items in their trailers, including clothing, books, magazines, televisions, radios, and personal computers, and to engage in personal activities while on call in the trailers, including sleeping, showering, cooking, eating, reading, watching television, listening to the radio, and surfing the internet. However, children, pets, and alcohol were not permitted on the premises, and adult visitors were permitted only if CPS's client permitted it.

On weekdays, trailer guards were generally scheduled to actively patrol the jobsites from 5:00 a.m. to 7:00 a.m. and from 3:00 p.m. to 9:00 p.m. (a total of eight hours).[5] On weekends, trailer guards were on active patrol from 5:00 a.m. to 9:00 p.m. (16 hours). During these times, they were paid an hourly rate. For eight hours every day, generally 9:00 p.m. to 5 a.m., the trailer guards were considered to be on call, which meant present on the jobsite or in the trailer, except as specified in the On-Call Agreements.

Under the On-Call Agreements, if a trailer guard wished to leave the jobsite during on-call hours, he or she was required to (1) notify a dispatcher, (2) provide information as to where the guard would be and for how long, and (3) wait for the reliever to arrive.[6] After leaving the jobsite, the guard was required to remain within a 30-minute radius and carry a pager or radio telephone. If called during that time, the guard was required to respond immediately. The trailer guards were not allowed to leave a jobsite before a reliever arrived. If no reliever was available, CPS had the right to order a trailer guard to remain at the jobsite, even if the trailer guard had an emergency. CPS did not consider on-call time when calculating hours worked, and trailer guards were paid for on-call time only if: (1)

---

[5] Between 7:00 a.m. and 3:00 p.m. (eight hours) on weekdays, when construction takes place on the jobsites, the trailer guards are free to leave and do as they please.

[6] The relievers are paid an hourly rate.

an alarm, noise, motion or other condition on the jobsite required investigation; or (2) they were waiting for or had been denied a reliever.[7]  When investigating a suspicious condition, the trailer guards were paid for the actual time spent conducting the investigation.  If a trailer guard spent three or more hours engaged in investigations during the on-call period, the guard would be paid for the entire eight hours.

### C. *Prior Governmental Opinions Related to Trailer Guards*

The parties stipulated that state and federal governmental agencies had weighed in on the legality of CPS's on-call policy or the legality of predecessor policies with similar features as set forth below.

### 1. *DLSE*

Beginning in 1996, the Division of Labor Standards Enforcement (DLSE) conducted an investigation and audit of CPS's policy with regard to trailer guards and their nighttime posting, which was then designated "sleep time."[8]  Under the policy then in place, trailer guards who wished to leave a jobsite were required to request permission 12 hours in advance to enable CPS to secure a reliever, and were not paid if no reliever was available.  In an April 1997 letter, the Chief Deputy Director of the Department of Industrial Relations and acting Labor

---

[7]     According to the stipulated facts, the trailer guards placed motion-sensitive alarms at strategic locations around the site.  The sensors were connected to an alarm panel that sounded either in CPS's dispatch center or in the trailer.  The trailer guards were required to be in uniform when investigating alarms or other suspicious activity.  The stipulated facts did not state how often trailer guards were likely to spend actively engaging in investigations during the on-call periods.

[8]     The DLSE, headed by the Labor Commissioner, "is 'empowered to enforce California's labor laws, including IWC wage orders.'" (*Reynolds v. Bement*, *supra*, 36 Cal. 4th at p. 1084.)

Commissioner noted that both DLSE and the federal Department of Labor had concluded "hours worked" did not include "sleep time, meal times, and all other times during which the employee is either free to leave the premises or is free to engage in private pursuits."[9] After review, the DLSE "f[ound] it appropriate to extend this rule to the live-in security guards of [CPS]" under the facts presented, which included the fact that "the guards [CPS] employ[ed] were homeless and [the trailer was] essentially their only place of residence."[10]

In 1999, the DLSE reversed its position on CPS's "sleep time" policy. In November 2002, CPS filed an action for declaratory relief seeking resolution of the policy's legality, which the parties settled by entering into an October 14, 2003 Memorandum of Understanding (MOU).[11] Under the MOU, CPS agreed to change the terms of employment for its trailer guards to include the following: "During the period between 9:00 p.m. and 5:00 a.m. (herein called 'free time') seven days a week, CPS shall implement a policy that provides the Trailer Guards are free to leave the site at will during this free time, subject to the following conditions: (i) that the Trailer Guard will be on 'stand-by' and subject to being required to respond to alarms and other recalls to work during those hours; (ii) that, before any Trailer Guard leaves the site, he/she shall call in to a central location and inform CPS that he/she is leaving, how long he/she intends to be gone from the site, and

---

[9] The letter noted that historically, the rule excluding sleep time had been narrowly applied to a handful of occupations, such as ambulance drivers and attendants, and that it had recently been expanded to include mini-storage managers, mortuary attendants, and private firefighters under various wage orders then in effect.

[10] CPS's cross-complaint alleged that its business plan came about when one of its founders noticed a homeless construction laborer sleeping in a park and "saw an opportunity to solve two problems at once" -- "[h]e decided to purchase a trailer and place it on the construction site, and he asked the day laborer if he wanted to live in the trailer. . . . The laborer agreed and theft and vandalism at the site immediately stopped."

[11] The MOU expired October 1, 2007.

where he/she intends to be; (iii) that the Trailer Guard shall carry a pager or other device that will allow CPS to contact him/her; (iv) that, if paged or otherwise summoned, the Trailer Guard shall answer the page or otherwise contact CPS immediately; and (v) that the Trailer Guard may be required to stay within a radius of distance that will allow him/her to return to the construction site within 30 minutes."[12]

## 2. *DOL*

In 1997, CPS had also requested a formal opinion from the United States Department of Labor (DOL) concerning its sleep time policy. In a letter dated March 24, 1997, the Assistant District Director of DOL advised CPS "that its sleep time agreements complied with federal regulations and that the designated sleep time hours did not need to be compensated as 'hours worked,' provided that the unpaid sleep time period was regularly scheduled and was at least 5 hours and not more than 8 hours per day . . . [and] [the] employee [was] paid when 'the unscheduled periods are so cut through with frequent work calls that this time is not his own.'"

CPS subsequently sought to determine whether DOL had changed its position and in 2010, sent a Freedom of Information Act request seeking records related to any DOL Wage and Hour Division investigations of CPS. CPS received

---

[12]    In addition, CPS was to pay the trailer guards at their regular rate of pay or at an overtime rate, if applicable, "for any time when, during free time, the Trailer Guard is required to respond to a page by returning to the construction site to take care of a problem," "for any free time spent by the Trailer Guard responding to an alarm while on the site," for the entire eight hours "[i]f the free time of any Trailer Guard is interrupted by work in response to pages and/or alarms to such an extent that the Trailer Guard is unable to have at least 5 hours of consecutive, uninterrupted free time," and during any period CPS required the trailer guard to remain at the jobsite "during all or any portion of his/her free time on any given occasion."

a copy of a 2009 memorandum, stating: "[T]he Department's position has not changed since the last investigation. The employer is still allowed to deduct the 8 hour sleep time as long as the trailer guards are able to get at least 6-hour[s] of sleep time per night," and that "no further action would be taken by the Department based on the fact that the Department's position has not changed, and [CPS] is [facing] two class action lawsuits dealing with [a] similar issue."[13]

### 3. *Hearing Officer Decision*

In 2008, class representative Larioza filed a wage claim against CPS with the Labor Commissioner, seeking unpaid overtime wages for his on-call time.[14] At an administrative hearing on September 3, 2009, Larioza testified that he stayed on site during the on-call hours "'if he felt like it.'" The hearing officer issued a written order denying Larioza's claim, concluding that he was not under the control of his employer during that time.

### D. *Trial Court's Summary Adjudication Order*

The trial court granted the Class's motion for summary adjudication and denied CPS's motion, finding that CPS's on-call policy violated Wage Order No. 4 and Labor Code section 1194.[15] The court specifically found that CPS's level of

---

[13]    We note that despite the memorandum's statement that DOL's position had not changed, DOL summarized its position in 2009 as requiring an additional hour of uninterrupted sleep time.

[14]    As explained in *Reynolds v. Bement*, *supra*, 36 Cal.4th at p. 1084, if "'an employer fails to pay wages in the amount, time or manner required by contract or by statute,'" the employee "may seek administrative relief by filing a wage claim with the commissioner pursuant to a special statutory scheme codified in [Labor Code] sections 98 to 98.8." (Italics omitted.)

[15]    For purposes of the litigation, the parties stipulated that Wage Order No. 4 was the IWC wage order applicable to trailer guards. By its terms, Wage Order No. 4 applies to
*(Fn. continued on next page.)*

9

control over the trailer guards during the on-call period was sufficient to bring the time within the applicable state law definition of "hours worked." The court found support for its conclusion in the fact that the trailer guards were required to live in the trailer during the on-call periods, the fact that their geographical movements were severely restricted, and the fact that they could engage in only limited personal activities. The court noted that the parties' On-Call Agreements expressly allowed CPS "to retain significant control over the [trailer guards]," by allowing it "to require the employees to return to the work site and/or remain on site." The fact that CPS's business model was "premised on the notion that theft and vandalism during the night and weekend hours can be deterred by the mere presence of a security guard in a residential trailer," further confirmed that "the 'on-call' time is spent predominantly for the benefit of the employer."

The trial court rejected CPS's contention that on the days the trailer guards were on duty 24 hours, eight hours could be allocated to sleep time and excluded from compensation, a rule applied to 24-hour employees in *Monzon v. Schaefer Ambulance Service, Inc.* (1990) 224 Cal.App.3d 16 (*Monzon*) and *Seymore v. Metson Marine, Inc*. (2011) 194 Cal.App.4th 361 (*Seymore*). The court distinguished those cases on the ground that a different wage order -- Wage Order No. 9, governing the transportation industry -- had been at issue, and found that applying the rule announced in those cases would "import a federal standard into . . . Wage Order [No.] 4 . . . ."

<hr />

"professional, technical, clerical, mechanical, and similar occupations," including "guards." (Cal. Code Regs., tit. 8, § 11040, subds. (1) and (2)(O).) Labor Code section 1194 provides that "[n]otwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation . . . ."

E. *Preliminary Injunction*

The Class sought a preliminary injunction preventing CPS from violating Wage Order No. 4, Labor Code section 1194, and any other applicable regulations and statutory provisions by refusing to pay Trailer Guards for on-call time. The court granted the request and entered an order enjoining CPS from (1) "continuing to violate [Wage Order No. 4], . . . and Labor Code § 1194 through CPS's application of an unlawful 'On-call' policy for Trailer Guards, which does not compensate for all time spent by the Trailer Guards at the worksites during 'On-call' time, which is generally between 9:00 p.m. and 5:00 a.m., and is specified in each 'On-call' agreement between the employer and each Trailer Guard" and (2) "failing to pay California Trailer Guards for all hours worked during 'On-call' time."[16] CPS appealed.

## DISCUSSION

A. *Standard of Review*

An application for a preliminary injunction should be granted when the plaintiff is "'likely to suffer greater injury from a denial of the injunction than the defendants are likely to suffer from its grant,'" and when there is "'a reasonable probability that the plaintiffs will prevail on the merits.'" (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 408, quoting *Robbins v. Superior Court* (1985) 38 Cal.3d 199, 206.) An order granting a preliminary injunction is an appealable order. (Code Civ. Proc., § 904.1, subd. (a)(6).) The trial court's decision to grant a

---

[16] In the same order, the court also "certifie[d] pursuant to Code of Civil Procedure § 166.1, that the Court's determination that CPS's 'On-call' policy violates Wage Order 4, [citation], and Labor Code section 1194 presents a controlling issue of law as to which there are substantial grounds for difference of opinion, appellate resolution of which may materially advance the conclusion of the litigation."

11

preliminary injunction is generally reviewed under an abuse of discretion standard. (*Cinquegrani v. Department of Motor Vehicles* (2008) 163 Cal.App.4th 741, 746.) However, if the facts on which the court relied are undisputed, the propriety of granting the injunction becomes a question of law. (*Ibid*.) In addition, to the extent the grant requires construction of statutes or regulations, the matter presents a question of law which we review independently. (*Ibid*.) Here, the appeal raises primarily questions of law -- in particular, whether the trial court correctly interpreted Wage Order No. 4 and other legal authorities in determining that the Class was likely to prevail on the merits of the claim seeking compensation for all on-call time.

B. *Standards Governing Interpretation of IWC Wage Orders*

"Nearly a century ago, the Legislature responded to the problem of inadequate wages and poor working conditions by establishing the IWC and delegating to it the authority to investigate various industries and promulgate wage orders fixing for each industry minimum wages, maximum hours of work, and conditions of labor." (*Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at p. 1026.) The IWC was "vested with broad statutory authority to investigate 'the comfort, health, safety, and welfare' of the California employees under its aegis [citation] and to establish (1) '[a] minimum wage . . . which shall not be less than a wage adequate to supply . . . the necessary cost of proper living and to maintain the health and welfare of such [employees],' (2) '[t]he maximum hours of work consistent with the health and welfare of [such employees]' and (3) '[t]he standard conditions of labor demanded by the health and welfare of [such employees] . . . .'" (*Industrial Welfare Com. v. Superior Court, supra*, 27 Cal.3d at p. 701.) Legislation enacted in 1973 directed the IWC to "continually . . . review and . . . update its 'rules, regulations and policies to the extent found by [it] to be

necessary to provide adequate and reasonable wages, hours, and working conditions appropriate for all employees in the modern society.'" (*Industrial Welfare Com. v. Superior Court, supra,* at pp. 701-702, quoting Lab. Code, § 1173 as enacted (Stats. 1973, ch. 1007, § 1.5, p. 2002), italics omitted.)

Once the IWC determined that "in any occupation, trade, or industry, the wages paid to employees [were] inadequate to supply the cost of proper living" or that "the hours or conditions of labor [were] prejudicial to the health, morals, or welfare of employees" (Lab. Code, § 1178), it was empowered to formulate wage orders to govern minimum wages, maximum hours, and overtime pay for such occupation, trade or industry. (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 795; *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 561.)[17] IWC wage orders "are to be accorded the same dignity as statutes"; in other words, they are "entitled to 'extraordinary deference, both in upholding their validity and in enforcing their specific terms.'" (*Brinker Restaurant Corp. v. Superior Court, supra*, 53 Cal.4th at p. 1027, quoting *Martinez v. Combs* (2010) 49 Cal.4th 35, 61.)

DLSE opinion letters, "''''''"while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to

---

[17] There are currently 18 wage orders, 16 relating to specific industries or occupations (manufacturing; personal service; canning, freezing and preserving; professional, technical, clerical, mechanical and the like; public housekeeping; laundry, linen supply and dry cleaning; mercantile; product handling after harvest (covering commercial packing sheds); transportation; amusement and recreation; broadcasting; motion picture; preparation of agricultural products for market (on the farm); agricultural; household; and construction, drilling, logging and mining), one general minimum wage order, and one order implementing the Eight-Hour-Day Restoration and Workplace Flexibility Act of 1999. (See Cal. Code Regs., tit. 8, §§ 11000-11170; *Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at p. 1026; *Reynolds v. Bement*, *supra*, 36 Cal.4th at p. 1084; *California Hotel & Motel Assn. v. Industrial Welfare Comm.* (1979) 25 Cal.3d 200, 205.)

which courts and litigants may properly resort for guidance.'"'"'" (*Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at p. 1029.)[18] However, they "need not be followed if they do not contain persuasive logic or if they unreasonably interpret a wage order." (*Cash v. Winn, supra,* 205 Cal.App.4th at p. 1302.) Although DLSE opinion letters are due "'consideration and respect,' it is ultimately the judiciary's role to construe the language [of the applicable wage order]." (*Harris v. Superior Court* (2011) 53 Cal.4th 170, 190.)[19]

"'[I]n light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees," the governing provisions are to be "'liberally construed with an eye to promoting such protection.'" (*Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 592, (*Morillion*) quoting *Industrial Welfare Com. v. Superior Court*, *supra*, 27 Cal.3d at p. 702.) Because California wage and hour laws are modeled to some extent on federal laws, federal cases may provide persuasive guidance where the language of the state statute or regulation parallels the language of the federal statute or regulation. (*Building Material &*

---

[18] The same is not true of the DLSE's operations and procedures manual, which our Supreme Court has held is a void regulation, entitled to no deference. (*Cash v. Winn* (2012) 205 Cal.App.4th 1285, 1301-1302, citing *Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 563 and *Tidewater Marine Western, Inc. v. Bradshaw*, *supra*, 14 Cal.4th at p. 572.) A court may nevertheless adopt a DLSE statutory interpretation contained in a void regulation "if the court independently determines that the interpretation is correct." (*Gattuso v. Harte-Hanks Shoppers, Inc.*, *supra*, at p. 563.)

[19] CPS contends the Labor Commission upheld its policy in October 2003 (the date of the MOU) and in September 2009, when the hearing officer rejected Larioza's claim for additional compensation. However, the MOU expired in 2007, and the hearing officer's decision was rendered on a different evidentiary record, as Larioza testified he could leave the jobsite when he "'felt like it.'" More important, as the above authorities make clear, a decision by the Labor Commissioner or the DLSE is only as persuasive as its reasoning.

14

*Construction Teamsters' Union v. Farrell* (1986) 41 Cal.3d 651, 658; *Nordquist v. McGraw-Hill Broad.* (1995) 32 Cal.App.4th 555, 562.)  However, "where the language or intent of state and federal labor laws substantially differ, reliance on federal regulations or interpretation to construe state regulations is misplaced." (*Ramirez v. Yosemite Water Co.*, *supra*, 20 Cal.4th at p. 798.)  Because "state law may provide employees greater protection than the [federal Fair Labor Standards Act]," if the IWC has not made clear its intent to adopt a federal standard, courts should "decline to import any federal standard, which expressly eliminates substantial protections to employees, by implication."  (*Morillion v. Royal Packing Co.*, *supra*, 22 Cal.4th at p. 592.)

C.  *Trailer Guards' Uncompensated Nighttime Hours*

At issue here is whether the hours the trailer guards spend in the trailers between 9:00 p.m. and 5:00 a.m. should be construed as "hours worked."  That term is defined in Wage Order No. 4 as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so."  (Cal. Code Regs., tit. 8, § 11040, subd. (2)(K).)[20]  CPS asserts two bases to support its argument that

[20]     All industry and occupation wage orders use this language to define "hours worked."  (See Cal. Code Regs., tit. 8, §§ 11010, subd. (2)(G), 11020, subd. (2)(G), 11030, subd. (2)(H), 11040, subd. (2)(K), 11050, subd. (2)(K), 11060, subd. (2)(G), 11070, subd. (2)(G), 11080, subd. (2)(G), 11090, subd. (2)(G), 11100, subd. (2)(H), 11110, subd. (2)(H), 11120, subd. (2)(H), 11130, subd. (2)(G), 11140, subd. (2)(G), 11050, subd. (2)(H), 11160, subd. (2)(J); *Morillion*, *supra*, 22 Cal.4th at pp. 581-582.)  Two include additional language:  Wage Order No. 4 adds:  "Within the health care industry, the term 'hours worked' means the time during which an employee is suffered or permitted to work for the employer, whether or not required to do so, as interpreted in accordance with the provisions of the Fair Labor Standards Act" (Cal. Code Regs., tit. 8, § 11040, subd. (2)(K)); Wage Order No. 5, governing the public housekeeping industry, adds:  "and in the case of an employee who is required to reside on the employment
*(Fn. continued on next page.)*

15

the subject hours are properly excluded from "hours worked":  (1) the trailer guards are merely "on call," free to engage in personal activities and not actively engaged in work unless and until an alarm sounds or they are otherwise actively engaged in investigation; and (2) the period constitutes excludable "sleep time." For the reasons set forth below, we conclude that the period does constitute hours worked, but that CPS may exclude from compensation up to eight hours a day as sleep time during the guards' 24-hour weekend shifts.

### 1. *On-Call Time*

It has long been recognized that an employee whom the employer perceives to be merely "on-call" may be engaged in compensable work.  "[A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen.  Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer."  (*Armour & Co. v. Wantock* (1944) 323 U.S. 126, 133 [private firefighters required to be on employer's premises were engaged in compensable work, although much of their time was spent in "idleness" and "amusements"].)  Over half a century ago, the United States Supreme Court held that on-call time falls within the category of hours worked if it is "spent predominantly for the employer's benefit," which is "dependent upon all the

---

premises, that time spent carrying out assigned duties shall be counted as hours worked. Within the health care industry, the term "hours worked" means the time during which an employee is suffered or permitted to work for the employer, whether or not required to do so, as interpreted in accordance with the provisions of the Fair Labor Standards Act." (Cal. Code Regs., tit. 8, § 11050, subd. (2)(K).)

circumstances of the case." (*Ibid*.; accord, *Skidmore v. Swift & Co*. (1944) 323 U.S. 134, 136-137.) "Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged. . . . The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was." (*Skidmore v. Swift & Co*., *supra*, 323 U.S. at p. 137.)

In *Morillion, supra,* 22 Cal.4th 575, our state Supreme Court held that the most significant factor in determining whether the employee's activities constitute "'hours worked'" is "[t]he level of the employer's control over its employees.'" (*Id*. at p. 587.) At issue in *Morillion* was the compensability of employee travel time where the employer required the employees -- teams of agricultural workers -- to meet at designated locations and to take the employer's buses to the various work sites. Noting that employees who commute on their own have considerably more freedom and "may choose and may be able to run errands before work and to leave from work early for personal appointments," the court held: "[B]y requiring employees to take certain transportation to a work site, [the employer] thereby subjects those employees to its control by determining when, where, and how they are to travel. Under the definition of 'hours worked,' that travel time is compensable. [Citation.]" (*Id*. at pp. 587-588.)

Courts determine the employer's level of control by analyzing a number of factors, beginning with the parties' agreement, which provides insight into how the parties believe the time should be characterized. (*Skidmore v. Swift & Co*., *supra*, 323 U.S. at p. 137; *Gomez v. Lincare, Inc.* (2009) 173 Cal.App.4th 508, 523; *Berry v. County of Sonoma* (9th Cir. 1994) 30 F.3d 1174, 1180-1181.) Courts also consider whether the restrictions on the employee's time "are primarily directed toward the fulfillment of the employer's requirements and policies," and whether the time "is so substantially restricted that [the employees] are unable to engage in private pursuits." (*Madera Police Officers Assn. v. City of Madera* (1984) 36

17

Cal.3d 403, 409.) In resolving the degree to which employees are able to engage in private pursuits during on-call time, courts generally apply seven factors: "'(1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on [the] employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.'" (*Gomez v. Lincare*, *Inc., supra*, 173 Cal.App.4th at p. 523, quoting *Owens v. Local No. 169* (9th Cir. 1992) 971 F.2d 347, 351; accord, *Seymore*, *supra*, 194 Cal.App.4th at p. 374.) Once the facts are ascertained, whether the limitations on employees' personal activities while on call are such that the time should be considered compensable is a question of law. (*Seymore*, *supra*, at p. 373.)

In *Gomez v. Lincare*, *Inc.,* the court found that the on-call time of employees who in their active duty hours delivered and set up in-home medical equipment was not properly categorized as hours worked. Although the employees were expected to respond to patient requests for assistance while on-call, there was no on-site living requirement, the geographic restrictions on the employees' ability to move about during on-call time were not excessive, they were provided pagers, and the time limits set for responses to pages -- 30 minutes to respond telephonically and two hours if a home visit was required -- were not unduly restrictive. (*Gomez v. Lincare*, *Inc., supra,* 173 Cal.App.4th at p. 524.) Moreover, the employees were permitted to freely trade on-call responsibilities with co-workers. (*Ibid*.)

Applying the same factors to different circumstances, the court reached a contrary conclusion in *Seymore*, *supra*, 194 Cal.App.4th at p. 361. There, the

plaintiff employees, who fell under Wage Order No. 9 governing the transportation industry, worked 14-day "hitches" on the defendant employer's ships, providing emergency cleanup of oil spills and other aquatic discharges. The employer considered the employees to be off duty or "on standby" during 12 of every 24 hours. During their hitches, the employees were required to sleep on board the vessel. They could leave during their standby time, but were required to check in and out, carry a cell phone or pager, and stay close by, so they could respond within 30 to 45 minutes if they received notification of an emergency. In concluding that the employees were entitled to additional compensation, the court found the most critical factor to be the requirement that the employees sleep at the employer's premises. The court noted that with the exception of certain occupations covered by a different wage order, "California courts have consistently held that an employee required to sleep at the worksite is subject to the employer's control during sleeping hours."[21] (*Seymore*, *supra*, at p. 376.) The employer's requirement that the employees sleep on board "significantly affect[ed] and limit[ed] what the employee[s] c[ould] and c[ould not] do during [their] . . . nonsleeping hours," and the limitations placed on the employees' whereabouts during the 12-hour standby period, viewed as a whole, "significantly restricted their ability to pursue activities of their choice." (*Id*. at p. 380.)

---

[21] The court distinguished *Isner v. Falkenberg/Gilliam & Associates, Inc*. (2008) 160 Cal.App.4th 1393 and *Brewer v. Patel* (1993) 20 Cal.App.4th 1017, which reached contrary conclusions interpreting Wage Order No. 5 (Cal. Code Regs., tit. 8, § 11050). (See *Seymore*, *supra*, 194 Cal.App.4th at p. 376.) As noted, Wage Order No. 5 governs the public housekeeping industry and includes in the definition of "hours worked" by employees required to reside on the employment premises only the time spent "carrying out assigned duties." (*Seymore*, *supra*, at pp. 376-377, Cal. Code Regs., tit. 8, § 11050, subd. (2)(K).)

19

In reaching its conclusion, the court in *Seymore* relied on earlier California cases holding that an employee is entitled to compensation when required to be on the employer's premises. These included *Aguilar v. Association for Retarded Citizens* (1991) 234 Cal.App.3d 21 (*Aguilar*). There, the plaintiffs were employed as personal attendants at a home for the mentally impaired and thus fell under Wage Order No. 5, governing the public housekeeping industry. (See Cal. Code Regs., tit. 8, § 111050, subd. 2(N).) They worked from 6:00 a.m. until 9:00 a.m., were off duty until 2:00 p.m., and were back on duty from 2:00 p.m. until 10:00 p.m. Between 10:00 p.m. and 6:00 a.m., they were required to be "on call" at the group home, but were permitted to sleep. They were not compensated for the overnight hours unless actively assisting one of the residents living in the home. (*Aguilar, supra,* 234 Cal.App.3d at p. 24.) Although the court in *Aguilar* did not apply the factors outlined in *Seymore*, it reached the same conclusion with respect to compensability of the on-call period. In the absence of any applicable exception in the wage order, the court found that the time fell under the broad definition of "'hours worked'" -- "the hours when an employee 'is subject to the control of an employer'" -- which "clearly includes time when an employee is required to be at the employer's premises and subject to the employer's control even though the employee was allowed to sleep." (*Id.* at p. 30.) Accordingly, the employees were "entitled to compensation for all the hours worked"; the employer was "not entitled to deduct those hours when it allow[ed] the employees to sleep." (*Id.* at p. 31; accord, *Bono Enterprises, Inc. v. Bradshaw* (1995) 32 Cal.App.4th 968, 975, disapproved on other grounds in *Tidewater Marine Western, Inc. v. Bradshaw*, *supra*, 14 Cal.4th at p. 574 [lunch period was compensable where employees were restricted from leaving work premises].)[22]

_____

[22] The employer in *Aguilar* sought to rely on section 3(J) of Wage Order No. 5,

*(Fn. continued on next page.)*

Here, the pertinent factors support the trial court's finding that the trailer guards' on-call hours represent hours worked for purposes of Wage Order No. 4. By their presence on site during the on-call hours, the guards perform an important function for their employer and its clients: they deter theft and vandalism. CPS promises its clients security services throughout the night and for 24 hours on Saturday and Sunday, and would be in breach if no security guards were present between 9:00 p.m. and 5:00 a.m. The parties' On-Call Agreements designate that period as "free time," but it is clear from the Agreements and the stipulated facts that trailer guards are not free to leave at will. A guard may leave only when and if a reliever is available. From this, it can reasonably be said that the restrictions on the on-call time are "primarily directed toward the fulfillment of the employer's requirements," and the guards are "substantially restricted" in their ability to engage in private pursuits. (See *Madera Police Officers Assn. v. City of Madera*, *supra*, 36 Cal.3d at p. 409.)

Of the seven factors listed in *Gomez v. Lincare*, *Inc.*, the majority favors a finding that during the on-call period, the trailer guards are significantly limited in

which excludes from daily overtime provisions "ambulance drivers and attendants scheduled for twenty-four (24) hour shifts of duty" who had "agreed in writing" to "exclude from daily time worked . . . a regularly scheduled uninterrupted sleeping period of not more than eight (8) hours." Acknowledging that this provision by its terms applied only to "ambulance drivers and attendants scheduled for twenty-four (24) hour shifts of duty," the employer argued that the court should nevertheless apply section 3(J) to the plaintiffs, as they were effectively working 24-hour shifts, while being "temporar[ily] release[d] . . . to attend to personal interests." (*Aguilar, supra,* 234 Cal.App.3d at pp. 30-31 & fn. 4.) The court was not persuaded: "[The employer's] characterization would abrogate the distinction between employees working 24-hour shifts and those working less than 24-hour shifts. Under [its] analysis, all employees in the work force could be characterized as working 24-hour shifts, with the only variation being the length of the 'temporary release . . . to attend to personal interests.' An accountant who worked 8 hours a day could be viewed as working a 24-hour shift with a 16-hour temporary release period." (*Id*. at p. 31.)

21

their ability to engage in personal activities.[23]  They are required to live on the jobsite.  They are expected to respond immediately, in uniform, when an alarm sounds or they hear suspicious noise or activity.  During the relevant hours, they are geographically limited to the trailer and/or the jobsite unless a reliever arrives; even then, they are required to take a pager or radio telephone so they may be called back; and they are required to remain within 30 minutes of the site unless other arrangements have been made.  They may not easily trade their responsibilities, but can only call for a reliever and hope one will be found.[24]

Most important, the trailer guards do not enjoy the normal freedoms of a typical off-duty worker, as they are forbidden to have children, pets or alcohol in the trailers and cannot entertain or visit with adult friends or family without special permission.  On this record, we conclude the degree of control exercised by the employer compels the conclusion that the trailer guards' on-call time falls under the definition of "hours worked" under California law.  (*Seymore*, *supra*, 194 Cal.App.4th at p. 380; *Madera Police Officers Assn. v. City of Madera*, *supra*, 36

---

[23]  The parties provided no evidence concerning one of the factors:  the frequency of the alarms or other nighttime interruptions.

[24]  The trailer guards' situation is far removed from the typical situation in which the ability to trade responsibilities has been found to be a significant factor in determining whether on-call time is compensable.  Generally, courts rely on this factor where multiple employees with the same skills are on call and no single one is required to respond to every call.  (See, e.g., *Gomez v. Lincare*, *Inc., supra*, 173 Cal.App.4th at p. 524; *Owens v. Local No. 169*, *supra*, 971 F.2d at pp. 348-349, 353, 354 [when emergency arose after hours, plant's mechanics were called sequentially until one agreed to return to plant to fix equipment; each individual mechanic was required to accept a "fair share" of call-ins, which, on average, amounted to six per year]; *Martin v. Ohio Turnpike Comm'n* (6th Cir. 1992) 968 F.2d 606, 611-612 & fn. 5 [when highway maintenance worker was too distant to arrive in time to help with emergency, employer called another worker, with no adverse consequences to worker originally called]; *Boehm v. Kansas City Power and Light Co.* (10th Cir. 1989) 868 F.2d 1182, 1185 [power company linemen were required to respond to one-third of callback requests].)

22

Cal.3d at pp. 408-410 [police officers' meal periods were compensable where time was not their own; officers were required to respond to telephone calls from superiors and in-person requests by citizens and to take immediate action to quell crimes committed in their presence, and were forbidden to conduct personal business while in uniform]; see also *Renfro v. City of Emporia* (10th Cir. 1991) 948 F.2d 1529, 1536-1537 [firefighters were unable to meaningfully engage in personal activity during on-call hours when required to answer every call -- three to five per on-call period -- and report within 20 minutes]; *Cross v. Arkansas Forestry Comm'n.* (8th Cir. 1991) 938 F.2d 912, 916-917 [conditions imposed by employer were sufficiently restrictive to require compensation for on-call periods where employees were required to monitor radio and were unable to participate in activities that would interfere with ability to listen, including musical events, sporting events, church services, and social gatherings].)

In reaching this conclusion, we note that several federal courts have found employees on call within a geographically-restricted area were not entitled to compensation until called to active duty.[25] However, in most such cases, the employees, although restricted in the distance they could travel from the jobsite, had considerably more freedom to engage in personal activities than do the trailer guards. (See, e.g., *Dinges v. Sacred Heart St. Mary's Hospitals* (7th Cir. 1999) 164 F.3d 1056, 1058 [plaintiff emergency medical technicians were not entitled to compensation during on-call time although required to respond within seven to 15 minutes; both lived within seven minutes of hospital and could cook, eat, sleep, read, exercise, watch TV, do housework, and care for pets, family, and loved ones

---

[25] Because state and federal courts both rely on the factors set forth in *Gomez v. Lincare, Inc.* and *Seymore* to determine whether on-call time is compensable, we may look to federal authorities for guidance.

at home, as well as watch children participate in sports, attend dance recitals, and frequent restaurants and parties in vicinity of home and hospital]; *Berry v. County of Sonoma, supra,* 30 F.3d at pp. 1184-1185 [coroners' on-call hours were not compensable although they were required to respond within 15 minutes; evidence indicated they were able to socialize with friends, dine out, shop, read, watch television and engage in hobbies]; *Bright v. Houston Northwest Medical Center Survivor, Inc.* (5th Cir. 1991) 934 F.2d 671, 676 [employee's on-call time was not compensable although he was required to stay within minutes of hospital; evidence showed he was able to carry on "normal personal activities at his own home," as well as "normal shopping, eating at restaurants, and the like"]; *Brock v. El Paso Natural Gas Co.* (5th Cir. 1987) 826 F.2d 369, 370 [employees of natural gas pump station located in remote area were not entitled to compensation during on-call time where on-call employees were free to eat, sleep, entertain guests, watch television or engage in any other personal recreational activity, alone or with family, as long as they stayed within hailing distance of alarm and station]; *Carman v. Yolo County Flood Control & Water Conservation Dist.* (E.D. Cal. 2008) 535 F.Supp.2d 1039, 1056-1057 ["damtender" was not entitled to additional compensation; though required to stay near dam, he was free to have visitors, dine with family, and attend lodge meetings, and spent numerous on-call hours making improvements to family home].)

CPS calls to our attention the federal rule embodied in the Code of Federal Regulations (C.F.R.), title 29, part 785.23, which provides: "An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus must have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. It is, of course, difficult to

24

determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted." CPS asks us to engraft that regulation onto Wage Order No. 4, reasoning that it is part of a "comprehensive" package of federal regulations that permits exclusion of sleep time from compensable hours under various circumstances, including some that are recognized in California. (See Part C.2, *ante*.) We decline to do so.

Preliminarily, we note that under its express terms, part 785.23, of 29 C.F.R., does not appear to apply to the instant situation, or any situation in which the employee is required to be present at the employer's premises during specified hours. It anticipates an agreement encompassing those periods when the employee has "enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he [or she] may leave the premises for purposes of his [or her] own." This may accurately describe the midday hours when the trailer guards are free to leave the premises, but it does not describe the hours from 9:00 p.m. to 5:00 a.m., when they remain on call. During the on-call period, the trailer guards do not have "complete freedom from all duties," and even if permitted to leave, must carry a pager and stay sufficiently close to the jobsite to be able to return within 30 minutes if required to do so.[26]

---

[26] In *Boman v. All The Little Things Count, L.L.C.* (S.D. Tex., Apr. 24, 2013, No. 3:12-CV-00077) 2013 U.S. Dist. LEXIS 70237, the court observed that "[a] plain reading of this regulation indicates that it could not apply to a situation . . . in which the employee is required to be at the employer's premises. . . , but rather addresses the quite different situation of someone who has the option of sleeping at the employer's premises but also has 'complete freedom . . . [to] leave the premises' and, for example, go to a movie theater, restaurant, or gym." (2013 U.S. Dist. LEXIS 70237, *8, fn. 2.) The court acknowledged, however, that "[d]espite this natural reading," the DOL "has long interpreted the section as applying to 'on duty' sleep time in the group home industry . . . ." (*Id.*, at p. *9.) We note that some federal courts have sided with the DOL and
*(Fn. continued on next page.)*

More important, as our Supreme Court has made clear, "[a]bsent convincing evidence of the IWC's intent to adopt the federal standard," we must "decline to import any federal standard, which expressly eliminates substantial protection to employees, by implication." (*Morillion*, *supra*, 22 Cal.4th at p. 592.) Likewise, we may not use federal authorities and regulations to construe state regulations where the language or intent of state and federal law substantially differs, and the federal law would provide less protection to California employees. (*Ramirez v. Yosemite Water Co.*, *supra*, 20 Cal.4th at p. 798.) CPS points to no provision of Wage Order No. 4 containing language that parallels that of 29 C.F.R. part 785.23, or to any evidence that the IWC intended to adopt that federal standard for security guards. The only wage order with language limiting the compensation to which a worker may be entitled while residing on the employer's premises is Wage Order No. 5, which states that in the case of an employee required to reside on the employment premises, only the time spent carrying out assigned duties should be counted as hours worked. But Wage Order No. 5 applies only to those in the public housekeeping industry and that language does not appear in any other wage order. Applying 29 C.F.R. part 785.23 or the language of Wage Order No. 5 to employees falling under other wage orders would deprive employees such as those in *Seymore*, who resided for extended periods of time on the employer's ships, of the additional compensation awarded by the court. Accordingly, we conclude that

---

applied part 785.23, of 29 C.F.R., beyond its literal terms. (See, e.g., *Bouchard v. Regional Governing Bd.* (8th Cir. 1991) 939 F.2d 1323, 1329-1330 [applying part 785.23 where employees of group home for developmentally disabled were expected to sleep at the home]; *Beaston v. Scotland School for Veterans' Children* (M.D. Pa. 1988) 693 F.Supp. 234, 240 [applying part 785.23 to houseparents at school for orphans required to remain on campus during sleep time].)

applying part 785.23 to California employees in the manner CPS urges would substantially impair the protections provided by California law.[27]

### 2. *Sleep Time During 24-Hour Weekend Shifts*

Although we agree with the trial court that the trailer guards' eight hours of on-call time during the week must be compensated, we reach a different conclusion with respect to their 24-hour weekend shifts. California courts have held that when an employee works a 24-hour shift, the employer and employee may exclude, by agreement, up to eight hours for "sleep time." (*Seymore*, *supra*, 194 Cal.App.4th at p. 381; *Monzon*, *supra*, 224 Cal.App.3d at p. 46.) The Class contends that the rule announced in *Seymore* and *Monzon* does not apply to employees falling under Wage Order No. 4. The Class further contends, and persuaded the trial court, that application of that rule to the instant case would violate the Supreme Court's proscription against adoption of federal regulations to eliminate protection to California employees. We disagree.

In *Monzon*, the employees were ambulance drivers and attendants who worked 24-hour shifts every other day -- a total of seven 24-hour shifts in each two-week period -- and received pay for 14 hours per shift. (*Monzon, supra,* 224 Cal.App.3d at p. 24.) Of the remaining 10 hours of their shifts, two hours were

---

[27] We find support for our conclusion in *Aguilar*, where the employer similarly urged the court to follow a federal DOL interpretation of hours worked, which permitted employers to deduct eight hours of sleep time for all resident employees, whether on duty 24 hours or not, and loosely defined "resident" to include employees who stayed at residential care home one or two nights a week, but maintained a primary residence elsewhere. (*Aguilar*, *supra*, 234 Cal.App.3d at pp. 31-34 & fn. 7.) The court stated: "[E]ven if we were persuaded by [DOL's] interpretation, federal law does not control unless it is more beneficial to employees than the state law. [Citation.] . . . Here, the state rule is clearly more beneficial to employees in compensating those employees for all the hours they are subject to [the employer's] control, including the hours during the overnight workshift when they are allowed to sleep." (*Aguilar, supra,* at p. 34.)

attributed to meal time and eight hours were attributed to sleep time, unless the driver or attendant was actively on duty so frequently during the 24-hour shift that there was no uninterrupted period of five hours available for sleep.[28]  The wage order at issue, Wage Order No. 9 governing the transportation industry, contained a provision expressly permitting "ambulance drivers and attendants" to "agree[] in writing" to exclude from overtime "a regularly scheduled uninterrupted sleeping period of not more than eight (8) hours."  (Cal. Code Regs., tit. 8, § 11090, subd. (3)(K).)[29]  The parties had not, however, entered into written employment agreements, although there was ample evidence of an implied agreement to exclude eight hours of sleep time per shift.  (224 Cal.App.3d at pp. 25, 47.)  The issue was whether, in the absence of a written agreement, the sleep time could be excluded.  Relying in part on the federal definition of hours worked codified in 29 C.F.R. part 785.22, the court held that "it is permissible for an employer and ambulance drivers and attendants to enter into an agreement, which need not be written, to exclude up to eight hours of sleep time from work or compensable time on twenty-four-hour shifts if adequate sleeping facilities are provided by the employer and the employee has the opportunity to get at least five hours of uninterrupted sleep."  (224 Cal.App.3d at p.  46.)[30]

---

[28]  The employer paid for five additional hours in this situation.  On appeal, it conceded it should have paid an additional eight hours when the driver or attendant did not have five continuous hours for sleep during his or her shift.  (*Monzon, supra,* 224 Cal.App.3d at pp. 24-25.)

[29]  At the time of the *Monzon* decision, this language was found in subdivision (3)(G) of the California Code of Regulations, title 8, section 11090.  (See *Monzon, supra,* 224 Cal.App.3d at pp. 31-32.)  It is now found in subdivision (3)(K) of section 11090.

[30]  Title 29 C.F.R. part 785.22 states:  "Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the
*(Fn. continued on next page.)*

28

*Monzon* was followed in *Seymore*, where the employees' active duty shifts on board the ships were 12 hours, and the court concluded the remaining 12 hours could not be designated uncompensated standby time due to the employer's requirement that the employees remain on or near the ships. The court held, however, that the employees were not entitled to compensation for the entire 12 standby hours: "As noted above, [the employer] allocated eight hours of unpaid time a day for sleep. The undisputed facts establish that sleeping facilities were provided for employees on the ships, and that it was exceptionally rare for their sleep to be interrupted by an emergency. The undisputed facts also establish an implied agreement between the parties that plaintiffs would not be compensated for eight hours of sleep time so long as their sleep was not interrupted. Prior to their employment, plaintiffs received a handbook that set forth [the employer's] compensation policies, including that employees would not be compensated for eight hours of 'off-duty' sleep time each day. Plaintiffs did not dispute that they were 'aware of and worked for [the employer] pursuant to the pay structure set forth in [the] employee handbook." (*Seymore, supra,* 194 Cal.App.4th at p. 382.) Accordingly, the plaintiffs were entitled to be compensated for "only four, rather than 12, hours of standby time during each 24-hour working day . . . ." (*Ibid.*)

The *Seymore* court rejected the plaintiffs' contention that *Monzon* applied only to ambulance drivers and attendants: "Plaintiffs are correct that wage order No. 9 provides an exemption for ambulance drivers and attendants who have agreed in writing to exclude from compensation eight hours of sleep in a 24-hour period. [Citation.] Nonetheless, the [*Monzon*] court held that this exemption was

employer and the employee can usually enjoy an uninterrupted night's sleep." In contrast, 29 C.F.R. part 785.21, provides: "An employee who is required to be on duty for less than 24 hours is working even though he is permitted to sleep or engage in other personal activities when not busy."

29

not applicable in [that] case because there was no written agreement. [Citation.] Instead, recognizing that the DLSE's 'enforcement policy for sleep time closely resembles the federal policy,' the court read into the state regulation defining compensable hours worked the provisions of the federal regulation, 29 [C.F.R.] part 785.22 . . . ." (*Seymore*, *supra*, 194 Cal.App.4th at pp. 381-382, quoting *Monzon*, *supra*, 224 Cal.App.3d at pp. 41-42.) The *Seymore* court went on to observe that "[i]n the 20 years since *Monzon* was decided, no judicial decision brought to our attention has disagreed with its ruling and neither the statute nor the regulations have been amended to modify the ruling." (*Seymore*, *supra*, at p. 382.)

A careful reading of the cases thus disposes of the Class's contention that the rule announced in *Monzon* and followed in *Seymore* was limited to employees governed by Wage Order No. 9. While that wage order contained a specific provision permitting an employer and employee to agree in writing to exclude sleep time from compensation, neither court relied on the provision to exclude the eight hours of sleep time. Instead, both courts looked to the wage order's definition of "hours worked" and found it comparable to the federal definition.[31] The court in *Monzon* explained that the exclusion for sleep time need not be written into the wage order because "the IWC's historical rule had been to permit the exclusion of sleep and meal periods"; thus, even without the specific exclusion applicable to ambulance drivers and attendants found in Wage Order No. 9, the agency recognized that parties could "agree that up to eight hours sleep time of a

---

[31] In fact, the court in *Monzon* found former section 3(G) of Wage Order No. 9 related only to the "relaxation of daily overtime requirements," and "did not affect the right of parties to agree that up to eight hours sleep time of a twenty-four hour shift might be excluded from compensable time." (*Monzon*, *supra*, 224 Cal.App.3d at pp. 44-45.)

twenty-four-hour shift might be excluded from compensable time." (224 Cal.App.3d at pp. 42, 45.)

We agree with the courts in *Seymore* and *Monzon* that because the state and federal definitions of hours worked are comparable and have a similar purpose, federal regulations and authorities may properly be consulted to determine whether sleep time may be excluded from 24-hour shifts. Further, we find this determination to be applicable to all wage orders that include essentially the same definition of "hours worked" found in Wage Order No. 9, including Wage Order No. 4.

There are sound reasons for permitting an employer who engages an employee to work a 24-hour shift and compensates him or her for 16 of those hours to exclude the remaining eight hours for sleep time, as long as the time is uninterrupted, a comfortable place is provided, and the parties enter into an agreement covering the period. Most employees would be sleeping for a similar period every day, whether on duty or not, and the compensation provided for the other 16 hours, which should generally include considerable overtime, ensures that the employees receive an adequate wage. While it is true that under the rule applied in *Seymore* and *Monzon*, an employee on duty less than 24 hours would be entitled to compensation for the same period, we find no incongruity. Unlike an employee called to work fewer hours, an employee on a regular 24-hour shift may be presumed to be spending a significant portion of that time asleep or resting. As the employee is being adequately compensated for all his or her waking hours, there is no need to require additional compensation for the period when the employee is asleep.[32]

---

[32] Federal regulations too recognize different treatment of employees, depending on the length of their shifts. As noted, 29 C.F.R. part 785.22 allows the exclusion of eight
*(Fn. continued on next page.)*

31

As the courts in *Seymore* and *Monzon* further held, the employer and employee must enter into an agreement before such time can be excluded; the burden is on the employer to prove that an agreement exists and to demonstrate its terms. (*Seymore*, *supra*, 194 Cal.App.4th at pp. 381-382; *Monzon*, *supra*, 224 Cal.App.3d at p. 46.) The On-Call Agreements here manifested the parties' intent that the trailer guards not be compensated for the eight hours between 9:00 p.m. and 5:00 a.m. Although the Agreements did not refer to this period as "sleep time," it is the period when most human beings are likely to be asleep and according to the stipulated facts, the guards are permitted to sleep during this period, or to relax in other ways, and are provided a home-like trailer with adequate sleeping facilities. The Agreements further provide that the guards will be compensated for all the time their ability to sleep is interrupted by the necessity of conducting investigations, and that on any night a guard does not receive at least five hours of uninterrupted free time, the entire eight hours will be compensated. Accordingly, the parties' On-Call Agreements fulfill the requirements that permit eight hours of sleep time to be excluded from their 24-hour weekend shifts.

---

hours of sleep time for employees on duty 24 hours or more, while part 785.21 deems an employee engaged for less than 24 hours to be working, even though permitted to sleep or engage in other personal activities. (See fn. 32, *ante*.)

## DISPOSITION

The order granting the preliminary injunction is reversed to the extent it requires CPS to compensate the trailer guards for the entirety of their 24-hour weekend shifts. On those days, the guards must be compensated for 16 hours; eight hours may be excluded for sleep time, provided the guards are afforded a comfortable place to sleep, the time is not interrupted, the guards are compensated for any period of interruption, and on any day they do not receive at least five consecutive hours of uninterrupted sleep time, they are compensated for the entire eight hours. In all other respects, the order is affirmed.

Each party is to bear its own costs.

**CERTIFIED FOR PUBLICATION**


MANELLA, J.


We concur:



WILLHITE, Acting P. J.



SUZUKAWA, J.

33